892 A.2d 694 (2006)
383 N.J. Super. 442
Robert ROWE, Plaintiff-Appellant,
v.
HOFFMANN-LA ROCHE INC., and Roche Laboratories Inc., Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued October 6, 2005.
Decided February 28, 2006.
*698 Brian J. Molloy, Woodbridge, argued the cause for appellant (Wilentz, Goldman & Spitzer, attorneys; Mr. Molloy of counsel; Jeffrey J. Brookner and Mr. Molloy on the brief).
Paul W. Schmidt, Boonton, (Covington & Burling) of the Washington, D.C. bar, admitted pro hac vice, argued the cause for respondents (Gibbons, Del Deo, Dolan, Griffinger & Vecchione, attorneys; Michael R. Griffinger, Diane E. Lifton, and Kristine V. Ryan, on the brief).
Before Judges WEFING, WECKER and GRAVES.
The opinion of the court was delivered by
WECKER, J.A.D.
This appeal from the dismissal of a products liability suit presents a choice of law question: whether New Jersey or Michigan law governs plaintiff's failure-to-warn claim. The appeal does not concern the adequacy of the warning itself, which is not part of the record before us, but only the choice of law to be applied.
Plaintiff, Robert Rowe, appeals from an order granting defendants' motion for summary judgment and dismissing his failure-to-warn complaint against defendants Hoffmann-La Roche Inc. and Roche Laboratories Inc. ("Roche"). The motion judge held that Michigan products liability law applied to plaintiff's claims, and that because defendants' warning for the drug had received approval by the United States Food and Drug Administration (FDA), defendants' warning was adequate as a matter of law under Michigan's products liability statute, specifically, M.C.L. § 600.2946(5). Plaintiff contends that a contrary provision of New Jersey's Products Liability Act, N.J.S.A. 2A:58C-1 to -11, applies, and that under New Jersey law, FDA approval provides only a rebuttable presumption that the warning was adequate. N.J.S.A. 2A:58C-4. We conclude that New Jersey products liability law respecting the effect of prior FDA approval applies to plaintiff's claim. We therefore reverse.
Rowe, who was at all relevant times a Michigan resident, claims that as a result of taking the prescription drug Accutane in 1997, when he was sixteen years old, he became severely depressed and attempted suicide several times. Accutane is an FDA-approved prescription drug for the treatment of severe recalcitrant nodular acne.[1] Rowe's Michigan dermatologist prescribed Accutane for him in Michigan, where he purchased and ingested the drug.
Defendants admit that their principal place of business is located in Nutley, New Jersey, and that Hoffmann-La Roche Inc. is a New Jersey corporation.[2] Almost the entire Accutane manufacturing process is conducted at the Nutley site. Defendants label and package Accutane in Nutley, where they maintain the Drug Regulatory Affairs unit, which is responsible for communications *699 with the FDA regarding Roche products, labeling, and warnings. Roche Laboratories Inc. also maintains its United States Accutane sales and distribution facilities in Nutley. In short, New Jersey is the exclusive location in the United States for defendants' domestic operations relating to sales, distribution, drug safety, drug regulatory affairs, and labeling of Accutane, as well as almost its entire manufacturing process.
Rowe's one-count amended complaint alleges that contrary to the New Jersey Products Liability Act, defendants negligently, carelessly, and recklessly placed Accutane into the stream of commerce by failing to timely and adequately warn him of the "dangers and adverse health risks associated with Accutane/Roaccutane"[3] and that defendants are liable to him for failing to provide an adequate warning of the possible psychological side-effects of Accutane. Rowe contends that defendants negligently failed to perform sufficient laboratory testing or obtain sufficient test results regarding a link between Accutane use and patient depression and suicide and that when defendants launched their Accutane marketing campaign, they knew that some patients who had taken the drug had experienced severe depression and some of those had even committed suicide. He contends that in March 1997, the French government ordered defendants to strengthen their Accutane warning "to include suicide as a possible side effect," and that Roche willfully failed to advise the FDA of the suicide warning it was required to provide in France to avoid imposition of a stronger warning requirement in the United States.
Defendants' answer to the amended complaint did not assert Michigan products liability law as a defense. Nonetheless, defendants brought their motion for summary judgment on the ground that plaintiff's claims were barred under Michigan law, specifically, M.C.L. § 600.2946(5). The motion judge permitted (and subsequently adopted) that defense over plaintiff's objection. The judge's decision to permit the defendants to move for summary judgment when Michigan law was not pled as a defense was within her discretion. See Erny v. Russo, 333 N.J.Super. 88, 96, 754 A.2d 606 (App.Div.2000), rev'd on other grounds, 171 N.J. 86, 792 A.2d 1208 (2002) (where the trial judge allowed the plaintiff to seek application of New York law after the liability trial, we said, "[i]n view of the broad discretion enjoyed by the trial court in such matters, we refrain from disturbing that determination.")
As a preliminary determination, the motion judge correctly found an actual conflict between Michigan law and New Jersey law on the viability of a failure-to-warn claim with respect to FDA-approved warnings. New Jersey law creates a rebuttal presumption that a drug warning is adequate if it was approved by the FDA:
In any product liability action the manufacturer or seller shall not be liable for harm caused by a failure to warn if the product contains an adequate warning or instruction or, in the case of dangers a manufacturer or seller discovers or reasonably should discover after the product leaves its control, if the manufacturer or seller provides an adequate warning or instruction. An adequate warning or instruction is one that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger and that communicates adequate information on the dangers and safe use of the product, *700 taking into account the characteristics of, and the ordinary knowledge common to, the persons by whom the product is intended to be used, or in the case of prescription drugs, taking into account the characteristics of, and the ordinary knowledge common to, the prescribing physician. If the warning or instruction given in connection with a drug or device or food or food additive has been approved or prescribed by the federal Food and Drug Administration under the "Federal Food, Drug, and Cosmetic Act," or the "Public Health Service Act," a rebuttable presumption shall arise that the warning or instruction is adequate.

[N.J.S.A. 2A:58C-4 (internal citations omitted) (emphasis added).]
Thus the presumption under New Jersey law, while strong, is not conclusive. See, e.g., Perez v. Wyeth Labs., Inc., 161 N.J. 1, 24, 734 A.2d 1245 (1999).
By contrast, an FDA-approved warning is adequate, that is, by definition "not defective" under Michigan law, which effectively provides absolute immunity to a drug manufacturer in a failure-to-warn case.
In a product liability action against a manufacturer or seller, a product that is a drug is not defective or unreasonably dangerous, and the manufacturer or seller is not liable, if the drug was approved for safety and efficacy by the United States [F]ood and [D]rug [A]dministration, and the drug and its labeling were in compliance with the United States [F]ood and [D]rug [A]dministration's approval at the time the drug left the control of the manufacturer or seller.
[M.C.L. § 600.2946(5).[4]]
The motion judge found that the goal of the New Jersey law is to "insure a high standard of care attaches to the ... drugs that are produced ... in New Jersey and distributed from New Jersey," whereas the goals underlying the Michigan law are "to encourage drug companies to market their products in Michigan so that their products are available to Michigan residents," and "to create predictable standards of due care for drug manufacturers who do business within Michigan."
The issue presented is entirely a question of law. On appeal, de novo review is therefore appropriate. Manalapan Realty v. Manalapan Twp. Comm., 140 N.J. 366, 378, 658 A.2d 1230 (1995) ("A *701 trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference."). As the forum state, New Jersey's choice-of-law rules apply. Fu v. Fu, 160 N.J. 108, 117, 733 A.2d 1133 (1999) (considering the dual interests of deterrence and compensation supported the application of New York law, which allowed vicarious liability against a motor vehicle's owner, rather than New Jersey law, which did not). The choice-of-law analysis here is governed by the analytical framework set forth in Gantes v. Kason Corp., 145 N.J. 478, 679 A.2d 106 (1996), and Erny v. Estate of Merola, 171 N.J. 86, 792 A.2d 1208 (2002). The dispute is how that analysis applies to the facts before us.
Whereas tort claims at one time were almost universally governed by the law of the place of injury, that approach was abandoned long ago. Mellk v. Sarahson, 49 N.J. 226, 228-29, 229 A.2d 625 (1967).
Where a foreign state has no real interest in having its law applied to a particular right or liability of parties to an event which occurred within its borders, a mechanical application of a disability or immunity imposed by lex loci delicti may work an unjust result having no relation to the purposes and policies behind the foreign law.
[Ibid.]
The Supreme Court has adopted a more flexible, governmental interest analysis in addressing choice-of-law issues, expressly holding that "[c]hoice-of-law determinations are made on an issue-by-issue basis, with each issue receiving separate analysis." Erny, supra, 171 N.J. at 94, 792 A.2d 1208 (New Jersey's law of comparative negligence but New York's law of joint and several liability applied, based on each state's interest in the application of its law). The law that applies is the law of the state with the greatest interest in the specific issue on which the laws conflict. E.g., Gantes, supra, 145 N.J. at 484, 679 A.2d 106 (Georgia had no interest in enforcing its statute of repose to protect a New Jersey manufacturer, and New Jersey's interest in deterring dangerous manufacturing within the state supported applying New Jersey's statute of limitations); Veazey v. Doremus, 103 N.J. 244, 247, 510 A.2d 1187 (1986) (where Florida husband and wife were involved in an automobile accident in New Jersey, Florida's interspousal immunity law applied; despite having abrogated interspousal immunity, New Jersey had no interest that outweighed Florida's interest in applying its law). The law of one jurisdiction may apply to a particular issue and the law of another jurisdiction may apply to a different issue in the same case. Erny, supra, 171 N.J. at 95, 792 A.2d 1208. As is evident in New Jersey cases involving conflicts of laws, governmental-interest analysis neither favors nor disfavors the law of the forum; there is clearly no automatic preference for applying the law of the forum.
The first step in resolving a potential conflict of laws issue is to determine whether an actual conflict exists. Fu, supra, 160 N.J. at 118, 733 A.2d 1133; Gantes, supra, 145 N.J. at 484-85, 679 A.2d 106. Clearly such a conflict exists here, for whether plaintiff's case withstands summary judgment depends upon which state's law applies. See, e.g., Gantes, supra, 145 N.J. at 484-85, 679 A.2d 106 (finding an "obvious and direct conflict" between Georgia's ten-year statute of repose and New Jersey's two-year statute of limitations where plaintiff's action would have been barred under the Georgia statute).
Because a true conflict exists, we must identify the governmental policies *702 underlying each state's law and consider whether and to what extent those policies are implicated in this litigation. Veazey, supra, 103 N.J. at 248, 510 A.2d 1187. A state's law will be applied only if doing so "will advance the policies that the law was intended to promote." Pfizer v. Employers Ins. of Wausau, 154 N.J. 187, 198, 712 A.2d 634 (1998). "If a state's contacts are not related to the policies underlying its law, then that state does not possess an interest in having its law apply." Veazey, supra, 103 N.J. at 248, 510 A.2d 1187. Thus "the qualitative, not the quantitative, nature of a state's contacts ultimately determines whether its law should apply." Ibid.
Sections 6, 145, and 146 of the Restatement inform our analysis of the competing interests in tort cases. See, e.g., Erny, supra, 171 N.J. at 95-97, 101-03, 792 A.2d 1208; Fu, supra, 160 N.J. at 119-25, 733 A.2d 1133. New Jersey's governmental-interest analysis has incorporated in substantial measure the approach of the Restatement (Second) of Conflict of Laws (1971) (Restatement). See Fu, supra, 160 N.J. at 119, 733 A.2d 1133; Heavner v. Uniroyal, Inc., 63 N.J. 130, 305 A.2d 412 (1973); Mellk, supra, 49 N.J. at 234, 229 A.2d 625. With respect to tort claims, such as those before us, the Restatement recommends that the law of the state which has the "most significant relationship to the occurrence and the parties under the principles stated in § 6 should apply." Restatement § 145(1). The five key factors in determining which state that is, under § 6, have been summarized as: "(1) the interests of interstate comity; (2) the interests of the parties; (3) the interests underlying the field of tort law; (4) the interests of judicial administration; and (5) the competing interests of the states." Fu, supra, 160 N.J. at 122, 733 A.2d 1133. "[T]he initial focus should be on what policies the legislature or court intended to protect by having [the] law apply to wholly domestic concerns, and then, whether these concerns will be furthered in applying [the] law to the multi-state situation." Erny, supra, 171 N.J. at 101-02, 792 A.2d 1208 (internal quotation marks and citation omitted). Of those five factors, the most important is "the competing interests of the states." Id. at 101, 792 A.2d 1208.
As to interstate comity, "a court must determine whether application of a competing state's law would frustrate the policies of other interested states." Id. at 102, 792 A.2d 1208 (internal quotation marks and citation omitted). When a court determines the interests underlying tort law generally, it "must consider the degree to which deterrence and compensation, the fundamental goals of tort law, would be furthered by the application of a state's local law." Ibid. (internal quotation marks and citation omitted). And "[b]ecause every tort rule, to some extent, is designed both to deter and to compensate, it is necessary to evaluate on a case-by-case basis the relative weight of those underlying purposes with respect to a specific rule." Ibid. (internal quotation marks and citation omitted).
The remaining two factors listed in Fu are less important in the choice-of-law determination. Erny, supra, 171 N.J. at 102, 792 A.2d 1208. "The interests of judicial administration afford courts a chance to consider the practicality of applying a specific law in a given situation; however, to the extent that factor conflicts with a strong state policy, the factor yields." Ibid. (internal quotation marks and citation omitted). And the parties' interests, being result-driven, are not a factor separate from each state's policy interests. See ibid.
*703 We now consider the respective interests of Michigan and New Jersey in having their laws respecting the effect of FDA-approval apply here, keeping in mind "deterrence and compensation, the fundamental goals of tort law." Erny, supra, 171 N.J. at 102, 792 A.2d 1208. To apply the general principles of conflicts law set forth in § 6 of the Restatement, a court should consider: (1) where the injury occurred; (2) where the conduct causing the injury occurred; (3) the parties' respective domiciles, residences, nationalities, places of incorporation, and principal places of business; and (4) the place, if any, where the parties' relationship is centered. Restatement § 145(2); Erny, supra, 171 N.J. at 103, 792 A.2d 1208.
Unlike many tort cases, where the blameworthy conduct and the injury occur in the same state, here the cited conduct of the defendants with respect to the Accutane warning occurred largely in New Jersey, whereas the injury, which could have occurred anywhere in the world, occurred in Michigan. "[T]he place where a product manufactured [in New Jersey] ultimately comes to rest and causes injury is a matter of pure fortuity." Gantes, 145 N.J. at 493, 679 A.2d 106 (citation and internal quotation marks omitted). Thus although place of injury is a significant factor in many tort actions, it does not warrant undue weight in product liability cases. See Erny, supra, 171 N.J. at 103, 792 A.2d 1208.
Comment (f) to § 6 of the Restatement addresses a hypothetical situation similar to what we face here:
The content of the relevant local law rule of a state may be significant in determining whether this state is the state with the dominant interest. So, for example, application of a state's statute or common law rule which would absolve the defendant from liability could hardly be justified on the basis of this state's interest in the welfare of the injured plaintiff.
Similarly, comment (e) to § 146 of the Restatement is relevant to our analysis:
[I]f the relevant local law rule of the state where the injury occurred would impose absolute liability upon the defendant, it is probable that this state is seeking by means of this rule to insure compensation for the injured person. If so, the interests of this state would be furthered by having its rule applied. If, on the other hand, the defendant would enjoy a special immunity for his conduct under the local law of the state of injury, it is not clear that the interests of this state would be furthered by application of its rule. The purpose of such a rule is presumably to encourage persons to engage in the particular conduct within the state. But in the situation here considered the defendant's conduct took place in another state and hence might be thought not to come within the purpose of the rule of the state of injury.

[Emphasis added].
Here, virtually all of Rowe's contacts relevant to his treatment with the drug Accutane obviously occurred in Michigan. But defendants' conduct, which is the object of Rowe's complaint, occurred almost entirely in New Jersey. Governmental interest analysis requires courts to consider, in the interest of interstate comity, whether application of one state's law will further or frustrate the policies underlying the law of any other state whose interests are implicated by the litigation. Fu, 160 N.J. at 122, 125, 733 A.2d 1133. The law of a jurisdiction other than that of the place of injury will apply when another jurisdiction has a dominant interest in the application of its law and the policy of the state where the injury occurred is not frustrated thereby. Erny, supra, 171 N.J. *704 at 103, 792 A.2d 1208; Restatement § 145, comment e and § 146, comment c.
The parties' circumstances and the issues before us here are similar in critical aspects to those the Court addressed in Gantes. There the choice-of-law issue was whether the New Jersey statute of limitations or the Georgia statute of repose would apply to plaintiff's products liability claim. Id. at 482, 679 A.2d 106. The plaintiff's decedent died as a result of being injured on her job in Georgia by a machine manufactured by the defendant in New Jersey. The decedent's estate filed suit against the manufacturer of the machine in New Jersey within New Jersey's two-year statute of limitations on personal injury claims. But the machine had been manufactured thirteen years before plaintiff's accident, and the defendant invoked Georgia's ten-year statute of repose, which applied to products liability claims against manufacturers.
The Court noted that the "goal of deterrence, acknowledged generally to be part of tort law, is especially important in the field of products-liability law." Gantes, supra, 145 N.J. at 489-90, 679 A.2d 106. The Court concluded:
[T]his State has a strong interest in encouraging the manufacture and distribution of safe products for the public and, conversely, in deterring the manufacture and distribution of unsafe products within the state. That interest is furthered through the recognition of claims and the imposition of liability based on principles of strict products-liability law.
[Id. at 490, 679 A.2d 106].
Further discussing the deterrence goal, the Court described the development of products liability law in New Jersey:
[T]his State's judiciary has been in the vanguard of the development of a responsive and progressive products liability law and has led the country in its ideological commitment to the protection of consumers and concomitant consequence of inducing those who place products into the stream of commerce to act with social responsibility . . . the development of products liability law in New Jersey and the consequent imposition of strict liability on manufacturers has been a powerful force  perhaps the most powerful force  in effecting, over the last two and a half decades, product safety and social responsibility by industry.
[Ibid. (internal quotation marks and citations omitted)].
The Court rejected the argument that New Jersey did not have an interest in exposing its domestic manufacturers to liability when the law of the state of injury would not hold them liable. Id. at 491, 679 A.2d 106. The Court described New Jersey's strong policy interest in deterring the manufacture of unsafe products within its borders as neither discriminatory nor unnecessarily burdensome. Gantes, supra, 145 N.J. at 491, 679 A.2d 106. The Court also rejected arguments that a decision to apply New Jersey law to the plaintiff's claims would breed forum-shopping and increase litigation, needlessly adding to the heavy caseloads already burdening New Jersey courts. Id. at 492, 679 A.2d 106. Specifically, as to the forum-shopping concerns, Justice Handler wrote for the Court: "[T]he policy against forum-shopping is intended to ensure that New Jersey courts are not burdened with cases that have only slender ties to New Jersey." Ibid. (internal quotation marks and citation omitted). Plaintiff's suit was "materially connected to New Jersey by the fact that the allegedly defective product was manufactured in and then shipped from" New Jersey. Ibid.
*705 The Court concluded that New Jersey's substantial deterrence interest would be furthered by the application of its statute of limitations, and concerns over injuring domestic manufacturers, forum-shopping, and increased litigation in New Jersey courts did not outweigh that deterrence interest. Id. at 492-93, 679 A.2d 106. On the other hand, Georgia had no interest in the application of its statute of repose, because application of its statute would not further any of the legislature's purposes in enacting the statute, and the application of the New Jersey statute would not frustrate any Georgia policy interest. Id. at 494, 679 A.2d 106. In choosing the appropriate law to apply, the Court focused on the purpose of the Georgia Legislature in enacting its statute of repose: to stabilize insurance underwriting for Georgia businesses and to keep stale claims out of Georgia courts. Id. at 493, 679 A.2d 106. The Court held that New Jersey's statute of limitations applied because the defendant was a New Jersey corporation that had manufactured the product in New Jersey and because of New Jersey's "strong interest in encouraging the manufacture and distribution of safe products . . . and, conversely, in deterring the manufacture and distribution of unsafe products within the state." Id. at 490, 679 A.2d 106. Those interests would be served by applying New Jersey law, whereas Georgia's interest in its statute of repose would neither be furthered by applying Georgia law nor frustrated by applying New Jersey law. Id. at 494-95, 679 A.2d 106. New Jersey's statute of limitations therefore applied to the plaintiff's claims. Gantes, supra, 145 N.J. at 498-99, 679 A.2d 106.
We must, however, consider Michigan's interest in applying its immunity law before we can fairly balance each state's interest in having its own law apply. We have found little guidance in Michigan case law respecting the Michigan Legislature's intent in enacting M.C.L. § 600.2946(5). In Ammend v. BioPort, Inc., 322 F.Supp.2d 848, 876 (W.D.Mich.2004), Michigan's interest in the application of its statute was implicitly assumed to be protection of Michigan drug manufacturers. In Ammend, several out-of-state plaintiffs, who alleged injuries resulting from an injection of anthrax vaccine, sued BioPort, the vaccine's Michigan-based drug-manufacturer. Id. at 852-53. The plaintiffs urged the court to apply the products liability laws of their respective domiciles rather than M.C.L. § 600.2946(5). Id. at 875-76. Utilizing a governmental-interest choice-of-law analysis, the federal district court held that the Michigan statute applied:
Michigan's interest in applying its law to this case strongly outweighs the interests of any foreign states. All Defendants. . . are Michigan residents with principal places of operation in Michigan. The anthrax vaccine . . . was produced in Michigan. Moreover, the Michigan legislature has expressly recognized Michigan's interest in regulating drug product manufacturers by enacting a drug product liability immunity statute, M.C.L. § 600.2946(5). Therefore, Michigan law, including the drug product liability immunity statute, controls in this case.
[Ibid.]
We infer that Michigan's purpose in enacting M.C.L § 600.2946(5), as part of a comprehensive tort reform bill, see House Legislative Analysis Section on Sen. B. 344 (First Analysis), June 8, 1995, may have been to protect Michigan businesses. The amended bills passed by the Michigan House and Senate, which included M.C.L. § 600.2946(5), also included provisions modifying joint and several liability, restricting non-economic damages, and adding defenses to products liability cases. Senate Fiscal Agency Analysis, *706 Sen. B. 344, H.B. 4508 (Revised Enrolled Analysis), January 11, 1996. The bills were supported by several Michigan business and manufacturing associations, but opposed by the Michigan Consumer Federation. See House Legislative Analysis Section on Sen. B. 344, p. 12, supra. Assuming the Michigan Legislature was concerned about the business climate in Michigan, there is no reason to think it was concerned about the business climate in New Jersey or elsewhere. While defendants contend that the Michigan Legislature did not intend its statute to be limited to domestic manufacturers, state laws normally do not operate outside their boundaries. See BMW of N. Am. v. Gore, 517 U.S. 559, 572 n. 16, 116 S.Ct. 1589, 1597 n. 16, 134 L.Ed.2d 809, 824 n. 16 (1996) ("Laws have no force of themselves beyond the jurisdiction of the State which enacts them, and can have extra-territorial effect only by the comity of other States") (Internal quotation marks and citation omitted).
Unlike BioPort, neither Hoffmann-La Roche Inc. nor Roche Laboratories Inc. are Michigan drug manufacturers. It is difficult to see how Michigan's interest in protecting Michigan drug manufacturers would be furthered by applying its immunity statute to this case. Likewise, it is difficult to see that Michigan has any interest in protecting out-of-state manufacturers like defendants here. The motion judge's finding that the primary purpose of the Michigan statute is to increase drug availability in Michigan is unsupported by the record. If in fact there was a shortage of drugs in Michigan at the time the statute was enacted, no evidence of such a shortage appears in the record before us. We know of no instance, and none has been cited to us, when a drug manufacturer has withheld distribution or sales of its product on account of any state's products liability law.[5]
Moreover, we must consider the impact that application of Michigan's immunity law would have upon New Jersey's interest in applying the rebuttable presumption of N.J.S.A. 2A:58C-4. Rowe cites what he describes as the New Jersey Supreme Court's "deep long-standing reluctance to cede control of drug regulation to the FDA," citing as examples, Perez, supra, 161 N.J. at 21-25, 734 A.2d 1245; Feldman v. Lederle Labs., 125 N.J. 117, 592 A.2d 1176 (1991), cert. denied, 505 U.S. 1219, 112 S.Ct. 3027, 120 L. Ed.2d 898 (1992); Feldman v. Lederle Labs., 97 N.J. 429, 446, 479 A.2d 374 (1984).[6] It is well within our common knowledge that the drug industry has a major presence in New Jersey, a fact that adds to New Jersey's interest in applying its liability law to failure-to-warn claims respecting FDA-approved drugs manufactured in the state.
*707 Even if the Michigan Legislature intended its immunity provision to apply to drug manufacturers outside its borders, as our dissenting colleague suggests, we agree with Rowe that to apply Michigan's immunity statute here would be contrary to New Jersey's interest expressed in the enactment of N.J.S.A. 2A:58C-4 as part of the Products Liability Act.
In enacting the Products Liability Act, the New Jersey Legislature balanced the competing interests of the consumer and the manufacturer and determined the appropriate level of protection each should be afforded. See N.J.S.A. 2A:58C-4. The Legislature determined that FDA approval of a drug's safety and its labeling should be a significant factor, indeed, that it would create a prima facie defense to any claim against the manufacturer based upon allegedly insufficient warnings. See id. By creating a rebuttable presumption, the Legislature provided a strong but not absolute defense, declining to immunize drug manufacturers and allowing a plaintiff who could present sufficient evidence of an inadequate or incomplete warning to prevail.[7]Ibid. It is not for us to engage in our own balancing of those interests or to tip the scales in favor of New Jersey drug manufacturers any more than the Legislature intended.
The Supreme Court's reasoning in Gantes with respect to New Jersey's interest in allowing a non-resident plaintiff's products liability claim to be heard on its merits rather than barred by a statute of repose applies as well to the bar that the Michigan immunity statute would impose if applied to plaintiff's complaint here. The Supreme Court's resolution of the competing arguments in Gantes weighs heavily in favor of applying New Jersey's rebuttable presumption and not Michigan's immunity law to the FDA-approved Accutane warning challenged by Rowe in this case.
In choosing which of the two states' laws to apply, the motion judge relied substantially on Deemer v. Silk City Textile Mach. Co., 193 N.J.Super. 643, 475 A.2d 648 (App.Div.1984), to conclude that applying New Jersey law in this case would "frustrat[e]. . . the aim of the Michigan Legislature." In Gantes, the Court distinguished Deemer, not on the basis of the conflicting laws being substantive rather than procedural in nature, but because in Deemer, this court found that applying New Jersey law to permit a suit filed by "the North Carolina resident against a manufacturer that was no longer in New Jersey would actually frustrate the policies of North Carolina's workers' compensation laws, [whereas] [n]o Georgia law is frustrated by the application of New Jersey's statute of limitations to allow the action to proceed in this State." Gantes, 145 N.J. at 494-95, 679 A.2d 106 (internal quotation marks and citation omitted). Similarly, we conclude that Michigan's immunity provision will not be frustrated by the application of New Jersey's rebuttable presumption to allow Rowe's claim to proceed here.
Although Deemer was distinguished without being expressly overruled in Gantes, its continued vitality has been questioned. See Eugene F. Scoles et al., Conflict of Laws 920 (4th ed.2004) (concluding that Deemer "is at least implicitly overruled by Gantes v. Kason Corp. . . . .").

*708 Gantes is noteworthy for favoring a foreign victim at the expense of a local manufacturer. Of course, Gantes did so not for the sake of protecting the victim, but rather in pursuance of the forum's policy of deterring the manufacture of substandard products within its territory.
[Scoles, Conflict of Laws, 920].
Even if Deemer is still good law, this case is not analogous to Deemer, where we applied North Carolina law because to apply New Jersey law there would have frustrated the purpose of the North Carolina law. See Deemer, supra, 193 N.J.Super. at 651, 475 A.2d 648.
We perceive no purpose underlying the Michigan statute that would be furthered by its application to Rowe's claims, nor any goal that would be frustrated by applying New Jersey law. Nor do we see any danger that applying New Jersey law in this case will lead to an influx of drug failure-to-warn cases brought by non-residents of New Jersey. The motion judge's concern implicitly assumes that many consumers of New Jersey-manufactured drugs live in states with immunity statutes similar to the Michigan statute. But our research has not disclosed a similar immunity statute in any other state. And a partial immunity, by way of what has been called "the government standards defense," is the law in only a minority of jurisdictions. David G. Owen, Special Defenses in Modern Products Liability Law, 70 Mo. L.Rev. 1, 13 (2005).
Many populous states either limit the defense to a rebuttable presumption of adequacy for an FDA-approved warning, or treat FDA-approval as one factor in determining a warning's adequacy.[8]E.g, Wells v. Ortho Pharm. Corp., 788 F.2d 741, 746 (11th Cir.) (applying Georgia law), cert. denied, 479 U.S. 950, 107 S.Ct. 437, 93 L. Ed.2d 386 (1986); Cartwright v. Pfizer, Inc., 369 F.Supp.2d 876, 882-86 (E.D.Tex.2005); Kociemba v. G.D. Searle & Co., 680 F.Supp. 1293, 1299 (D.Minn. 1988); Carlin v. Superior Court, 13 Cal.4th 1104, 56 Cal.Rptr.2d 162, 920 P.2d 1347, 1353 n. 4 (1996); Toner v. Lederle Labs., 112 Idaho 328, 732 P.2d 297, 311 n. 12 (1987); Malek v. Lederle Labs., 125 Ill.App.3d 870, 81 Ill.Dec. 236, 466 N.E.2d 1038, 1039-40 (1984); Bell v. Lollar, 791 N.E.2d 849, 854 (Ind.Ct.App.2003); Savina v. Sterling Drug, Inc., 247 Kan. 105, 795 P.2d 915, 931 (1990); MacDonald v. Ortho Pharm. Corp., 394 Mass. 131, 475 N.E.2d 65, 70-71 (Mass.), cert. denied, 474 U.S. 920, 106 S.Ct. 250, 88 L. Ed.2d 258 (1985); Edwards v. Basel Pharm., 933 P.2d 298, 302-03 (Okla.1997); Kurer v. Parke, Davis & Co., 272 Wis.2d 390, 679 N.W.2d 867, 874-75 (Ct.App.2004).
We have also considered the compensation aspect of governmental interest analysis in this tort case, and we perceive no Michigan interest in depriving its resident of recovery. We might view plaintiff's home state interest differently if we were confronted with a conflict of laws related to plaintiff's own role in causing the injury, such as laws of contributory or comparative negligence. Such a conflict would implicate the deterrence aspect of tort law as it relates both to plaintiff and defendant. No such conflict is raised by this appeal.
*709 We see little chance that our courts will become a haven for products liability suits against drug manufacturers if plaintiff succeeds on the choice-of-law issue. As we noted above, the Supreme Court expressly rejected such reasoning in Gantes, where those same concerns were found not to outweigh New Jersey's strong interest in deterring the manufacture of unsafe products within its borders. Gantes, supra, 145 N.J. at 492-93, 679 A.2d 106.
We also reject the suggestion that Gantes applies solely to issues of so-called procedural law, like statutes of limitations, and not to choice-of-law issues concerning which state's substantive law should apply.
Whether Georgia's statute of repose must be applied as a constituent part of its substantive tort law depends not on its characterization as substantive law but on the issue-specific analysis that governs choice-of-law determinations and on whether the contacts that Georgia has with the parties and the litigation create a governmental interest that requires the application of its statute of repose to settle that issue.
[Id. at 495, 679 A.2d 106 (emphasis added)].
In sum, the quality of New Jersey's contacts in this case, when combined with its strong governmental interest in deterring the manufacture of unsafe products within its borders, substantially outweighs the countervailing Michigan contacts and governmental interests in application of the Michigan statute.[9] Both deterrence and compensation are interests more likely to be served in this case by application of New Jersey law than Michigan law. New Jersey law therefore applies to plaintiff's products liability failure-to-warn claim.
We need not separately address Rowe's negligence claim, which is subsumed in his products liability claim. See, e.g., Becker v. Baron Bros., 138 N.J. 145, 152-53, 649 A.2d 613 (1994); Green v. Gen. Motors Corp., 310 N.J.Super. 507, 517, 709 A.2d 205 (App.Div.), certif. denied, 156 N.J. 381, 718 A.2d 1210 (1998).
Reversed and remanded for further proceedings consistent with this opinion.
WEFING, P.J.A.D., dissenting.
Plaintiff is a Michigan resident who was treated by a Michigan physician. He received from that physician a prescription for Accutane. The prescription was filled in the State of Michigan, and plaintiff consumed the medication in Michigan. My colleagues have, nonetheless, concluded that plaintiff's cause of action is governed by New Jersey product liability law, specifically N.J.S.A. 2A:58C-4, which creates a rebuttable presumption that a drug warning that has been approved by the Food and Drug Administration is adequate, rather than Michigan's statute, which exempts a drug manufacturer from liability if the drug and its labeling have been approved by the Food and Drug Administration. I am unable to agree and thus dissent; I would affirm the trial court's order before us on appeal.
I have no fundamental quarrel with the legal principles set forth by Judge Wecker in her discussion of the proper methodology to address choice of law issues, and there is no necessity to repeat them here. My disagreement springs from the manner *710 in which my colleagues apply those principles to the question before us.
Specifically, my colleagues conclude that application of New Jersey law furthers the fundamental goals of tort lawdeterrence and compensationwithout frustrating Michigan's interest in having its law apply to claims asserted by its citizens for injuries that occurred in that state. Such a conclusion, in my view, does not accord sufficient weight to the policy judgment reached by the Michigan Legislature when it enacted subsection (5) of M.C.L. § 600.2946.
I do not share my colleagues' inference that the purpose of the Michigan Legislature in adopting this legislation was restricted to the protection of Michigan businesses, specifically Michigan drug manufacturers. Rather, as they note, this provision was but one part of a comprehensive tort reform bill passed by the Michigan Legislature that addressed a variety of topics, including joint and several liability, expert testimony, and limitations on damages for non-economic losses.
In my judgment, the legislative history that has been presented to us speaks of a wider concern than a parochial desire to protect local pharmaceutical manufacturers. In the opening Rationale to the Fiscal Analysis prepared by the Senate Fiscal Agency, for instance, the Agency refers to a number of factors, including "reduced capacity of firms to compete internationally, curtailed innovation, reduced funding for research, higher consumer costs, and unaffordable or unavailable casualty insurance." Senate Fiscal Agency Analysis, Sen. B. 344, H.B. 4508 (Revised Enrolled Analysis), January 11, 1996. The United State Court of Appeals for the Sixth Circuit recognized these concerns as motivating this legislation. Garcia v. Wyeth-Ayerst Labs., 385 F.3d 961, 967 (6th Cir.2004) (stating "it appears that the Michigan legislature was concerned that unlimited liability for drug manufacturers would threaten the financial viability of many enterprises and could add substantially to the cost and unavailability of many drugs").
Such concerns have been noted by others. Schwartz, Regulatory Standards and Products Liability: Striking the Right Balance Between the Two, 30 U. Mich. J.L. Reform 431, 457 (1997) (recognizing "the adverse impacts of tort liability on pharmaceutical research and development"); Viscusi, Rowland, Dorfman and Walsh, Deterring Inefficient Pharmaceutical Litigation: An Economic Rationale for the FDA Regulatory Compliance Defense, 24 Seton Hall L.Rev. 1437, 1470-73 (1994) (noting "[a]lthough many courts invoked the strict liability rationale that the imposition of liability would encourage a safer vaccine, the prospect of multi-million dollar verdicts instead induced manufacturers to abandon the vaccine market altogether. . . . the increasing cost of vaccines is a factor in the declining immunization rates in the United States").
One may disagree with the policy choice made by the Michigan Legislature in selecting a method to deal with these concerns (a choice upheld by the Michigan Supreme Court in Taylor v. Smithkline Beecham Corp., 468 Mich. 1, 658 N.W.2d 127 (2003)), but that choice lay within the purview of that legislature. Stupak v. Hoffman-La Roche, Inc., 287 F.Supp.2d 968 (E.D.Wis.2003) (applying Wisconsin law to the claim of Michigan resident who was treated by a Wisconsin dermatologist and received a prescription for Accutane; after noting the differences between the policies of Wisconsin and Michigan, the court posited "It is not for this court to say which policy better serves justice and the public interest. That determination is entrusted *711 to the legislatures of the respective states . . .").
In my judgment, if the actions of the Michigan Legislature sprang from concern about the effect of litigation on the availability and cost of prescription medications for its citizens, application of New Jersey law to this matter serves to frustrate the aim of that Legislature. The costs of this litigation do not remain within New Jersey but have an impact and a consequence upon citizens elsewhere.
Several other factors inform my analysis. The goals of tort law are, as has been noted, compensation and deterrence. In deciding whether the law of Michigan or New Jersey applies to this matter, it is appropriate to weigh the governmental interests of each state in terms of furthering those interests. I am unable to perceive what governmental interest New Jersey has in seeking to assure compensation for a Michigan resident when the Michigan Legislature has determined that compensation is not available.
In addition, I cannot conclude that applying Michigan law would frustrate New Jersey's interest in deterrence. Pharmaceutical manufacturers do not supply different labels in different states, depending upon the nature of that state's product liability law. A New Jersey pharmaceutical manufacturer cannot rest secure based upon its knowledge that its labeling and warnings have been approved by the FDA because our legislature has declined to afford the pharmaceutical industry a blanket immunity based upon such FDA approval. Whatever deterrence is created by N.J.S.A. 2A:58C-4's rebuttable presumption remains and is unaffected by applying Michigan law to a Michigan claimant who was treated in Michigan.
Further, I note that New Jersey courts are, for whatever reason, the site of much mass-tort litigation. The Mass Tort Information Center in NJCourtsonline.com, for example, lists seven pending mass tort actions in New Jersey involving pharmaceuticals. New Jersey should not become the asylum for claims asserted by citizens of another state whose legislature has made a policy choice to immunize a particular defendant from such litigation.
Finally, because, as I have noted, it is my judgment that application of Michigan law to this matter does not frustrate New Jersey's interest in deterrence, I do not read Gantes v. Kason Corp., 145 N.J. 478, 679 A.2d 106 (1996), to require affording plaintiff the benefit of New Jersey's rebuttable presumption.
NOTES
[1] Accutane is known generically as isotretinoin.
[2] We have found these descriptions of the defendant entities on the website www.rocheusa.com:

Hoffmann-La Roche Inc..... provides a wide range of medications in the United States through its marketing and sales subsidiary, Roche Laboratories Inc. Headquartered in Nutley, N.J., both companies are members of the Basel, Switzerland-based Roche Group.
....
The Roche Group incorporates all those companies that are wholly owned by Roche Holding Ltd, .... based in Basel, Switzerland.
[3] Accutane is sold under the name Roaccutane in certain other countries.
[4] Two narrow exceptions were written into the Michigan statute as originally enacted:

This subsection does not apply if the defendant at any time before the event that allegedly caused the injury does any of the following:
(a) Intentionally withholds from or misrepresents to the United States [F]ood and [D]rug [A]dministration information concerning the drug that is required to be submitted under the federal food, drug, and cosmetic act ... and the drug would not have been approved, or the United States [F]ood and [D]rug [A]dministration [sic] would have withdrawn approval for the drug if the information were accurately submitted.
(b) Makes an illegal payment to an official or employee of the United States food and drug administration [sic] for the purpose of securing or maintaining approval of the drug.
[M.C.L. § 600.2946(5)(a) and (b)].
But those exceptions were declared unconstitutional, while the balance of the statute was upheld. Garcia v. Wyeth-Ayerst Labs., 385 F.3d 961, 967-68 (6th Cir.2004). The motion judge denied Rowe's request to reopen discovery to obtain evidence that his claim could go forward under either of those exceptions. Rowe concedes on appeal that he cannot now proceed on his fraud claim or continue his appeal on his right to discovery thereon. He seeks, however, to preserve his right "to reassert this issue" in the event that Garcia is "vacate[d], reverse[d], or overrule[d]." Under the circumstances, we will not address that request, or the underlying argument.
[5] Although not mentioned by defendants, we recognize another potential rationale for the Michigan law. By immunizing drug manufacturers who have received FDA approval for their drug warnings from failure-to-warn claims, the Michigan Legislature may have intended to create a more hospitable commercial atmosphere, to encourage drug manufacturers to locate in that state, thereby creating jobs and related economic benefits. Clearly, however, such a goal  and thus Michigan's interest in applying its statute in this case  is not impeded by a ruling that rejects the application of Michigan's statute to these out-of-state defendants. Indeed, quite the opposite interest can be inferred. For if we limit application of Michigan's law to Michigan drug companies, that would, arguably, create an incentive for New Jersey drug companies to relocate to Michigan.
[6] For a discussion of the strength of New Jersey's statutory presumption, as interpreted by Perez, see Dreier, Keefe & Katz, Current N.J. Products Liability & Toxic Torts Law § 15.4 (2005).
[7] Under Michigan's law, there appears to be no exception to the protection afforded by FDA-approval, even when information about a drug's hazards becomes known after approval and before further FDA action to modify the required warning or withdraw the drug from the market. See M.C.L. § 600.2946(5). See generally Robert L. Rabin, Symposium: Regulatory Compliance As A Defense to Products Liability: Keynote Paper: Reassessing Regulatory Compliance, 88 Geo. L.J.2049, 2077 (2000).
[8] In a non-exhaustive search, we have identified nine states that either accord an FDA-approved warning a rebuttable presumption of adequacy similar to New Jersey's, or simply allow FDA-approval as a factor to be considered in determining the adequacy of such warning. The population of those states, according to the 2000 United States census, constitutes over 100 million people, more than one-third of the nation's population. See U.S. Census Bureau, Annual Population Estimates 2000-2005, available at: http://www.census.gov/popest/states/tables/NST-EST2005-01.xls.
[9] One commentator has theorized that when a conflict of laws question arises in a tort case, the conduct-regulating law of the jurisdiction in which the allegedly blameworthy conduct occurred (in products liability cases, likely the place of manufacture) is generally applied. John T. Cross, The Conduct-Regulating Exception in Modern United States Choice-of-law, 36 Creighton L.Rev. 425 (2003).